GEOFFREY A. NERI (SBN 258802)
 Geoff@bnsklaw.com
ROWENNAKETE P. BARNES (SBN 302037)
 Kete@bnsklaw.com
**BROWN NERI, SMITH & KHAN LLP**
11766 Wilshire Blvd., Ste. 1670
Los Angeles, CA 90025
T: (310) 593-9890
F: (310) 593-9980

Attorneys for Plaintiffs Standard Furniture Manufacturing Company, Inc. and International Furniture Marketing, Inc.

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# SANTA ANA DIVISION

| | |
|---|---|
| STANDARD FURNITURE MANUFACTURING COMPANY, INC., an Alabama corporation; and INTERNATIONAL FURNITURE MARKETING, INC., an Alabama corporation,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>LF PRODUCTS PTE LTD., a Singapore corporation; ALTON IRVINE, INC. d/b/a TRUE INNOVATIONS, a Delaware corporations: TRUE DESIGNS, INC., a foreign corporation, and DOES 1-10, inclusive,<br><br>　　　　Defendantss. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>(1) BREACH OF CONTRACT;<br>(2) NEGLIGENCE;<br>(3) FRAUD BY CONCEALMENT;<br>(4) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;<br>(5) VIOLATION OF SECTION 17200 OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

COMPLAINT

# INTRODUCTION

1. Plaintiff Standard Furniture Manufacturing Company, Inc. ("Standard") is an Alabama company that designs, manufactures and distributes a diverse array of "case goods", including high-quality, leather upholstered furniture.

2. Standard, along with its corporate affiliate, International Furniture Marketing, Inc. ("IFM") engaged the Defendants in this case to create a supply chain with factories in China to supply nine suites of furniture to be marketed and sold by Standard and IFM in connection with a strategic licensing partnership IFM had entered into with celebrity home designers Joanna and Chip Gaines.

3. Two suites of the furniture were to be comprised of leather upholstered chairs and couches. Standard and IFM, on the one hand, and the Defendants, on the other hand, agreed that the raw material for these chairs and couches would be a top grain cowhide, reflected in a "master standard" leather sample signed by representatives of Standard and IFM and the Defendants.

4. Prior to the first shipment of this furniture from China, Defendants showed Standard's and IFM's quality control team a hand-selected sample of the furniture (approximately 8-9%) in order to induce approval by Standard.

5. Because this select sample was in conformity with the master standard, payment for and an initial shipment of the furniture was approved. However, unbeknownst to Standard and IFM, the remaining product (over 90% of it) and shipments would not be in conformity with the master standard.

6. In fact, Defendants unilaterally changed the raw material used in the remaining product to ***water buffalo hide***, a cheaper and completely unacceptable alternative to the top grain cowhide that had been agreed upon.

7. In addition, there was an unapproved and extreme departure from the "distressed leather" color and finish that had been agreed upon, as evident from the side-by-side photos below, that rendered the furniture unmarketable, unsaleable and unfit for the purposes it was intended.

COMPLAINT

1

[Photo: Correct color and finish / Incorrect color and finish]

8. This "bait and switch" was discovered in an embarrassing and damaging manner for Standard and IFM when their licensing partner Joanna Gaines was shipped and opened a box containing the defective furniture. It was immediately apparent to Ms. Gaines that the product was substandard and unsaleable.

9. Ms. Gaines promptly alerted Standard and IFM to the fact that the furniture was defective, who in turn contacted Defendants in an attempt to mitigate damages and obtain Defendants cooperation in remedying the defects.

10. Standard requested that representatives of Defendants visit Standard's distribution center to inspect the product and see for themselves the obvious defects in the furniture that had been shipped to and received by Standard.

11. Defendants refused to perform an inspection of the defective furniture at Standard's distribution center, which was and is highly irregular and a breach of standard protocol. Instead, Defendants insisted that Standard and IFM had approved what Defendants claimed (falsely) was a slight variation in color rather than an

unapproved, unacceptable and dramatic change in color and finish, as well as substitution of raw material.

12. Adding further insult to injury, Defendants wrote directly to several suppliers, manufacturers and other vendors in China who were already doing business with Standard and IFM and urged those vendors not to continue doing business with Standard.

13. Ultimately, 100% of the defective furniture had to be recalled and Standard was and is left warehousing approximately $600,000 of worthless product that Defendants to this day to refuse to inspect or acknowledge is defective.

14. By and through this action, Standard seeks restitution and the disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by Defendants, including, but not limited to, the approximately $650,000 paid to Defendants for the defective product at issue and related freight and customs charges, as well as damages, including punitive damages, for Defendants' tortious conduct, in an amount to be proven at trial, but believed to be in excess of $2 million.

## THE PARTIES

15. Plaintiff Standard is corporation organized and existing under the laws of the state of Alabama with its principal place of business in Bay Minette, Alabama.

16. Plaintiff International Furniture Marketing, Inc. ("IFM") is a corporation organized and existing under the laws of the state of Alabama with its principal place of business in Bay Minette, Alabama. IFM is a corporate affiliate of Standard.

17. Upon information and belief, Defendant LF Products PTE LTD ("Li & Fung"), is a corporation organized and existing under the laws of the Republic of Singapore, with its principal place of business at 10 Raeburn Park, Block A #3-08 Singapore 088702.

18. Upon information and belief, Defendant Alton Irvine, Inc., does business as "True Innovations' and is organized and existing under the laws of Delaware, with its principal place of business in Irvine, California.

19. Upon information, Defendant True Designs, Inc. ("True Designs") is a foreign corporation organized and existing under the laws of the State of Delaware with its principal place of business in Irvine, California.

20. Upon information and belief, True Innovations and True Designs (hereinafter, together referred to as True Innovations), are wholly-owned subsidiaries of Li & Fung.

21. The names of other Defendants and/or their involvement in this dispute are presently unknown to Plaintiffs, who therefore sue such Defendants in this action by fictitious names. Each of the Defendants designated as a DOES 1-10 is legally responsible in some manner for the unlawful acts described above. Plaintiffs will seek leave of the Court to amend this Complaint to reflect the true names and capacities of the DOE defendants as and when their identities become known.

22. Each Defendant is the agent, servant and/or employee of other Defendants and each Defendant was acting within the course and scope of his, her or its authority as agent, servant and/or employee of the other Defendants. Defendants, and each of them, are individuals, limited liability companies, or corporations which joined in and conspired with the other wrongdoers in carrying out the tortious and unlawful acts described herein, and Defendants, and each of them, ratified those acts.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332(a), because there is complete diversity of citizenship between the parties and more than $75,000, exclusive of interests and costs, is at stake.

24. Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in this judicial district because a substantial part of the events or omissions giving rise to this claim

occurred in this district. Venue is also proper pursuant to 28 U.S.C. §1391(b)(3) because Defendants are subject to personal jurisdiction in California.

25. Upon information and belief, this Court has personal jurisdiction over Defendants based on Defendants' continuous and systematic minimum contacts with residents of California through the offerings of its services and/or products and involvement with residents of California, within this judicial district, and elsewhere.

## FACTUAL ALLEGATIONS

### A. Standard and IFM Partner with Joanna and Chip Gaines to create Magnolia Home

26. Standard is based in Bay Minette, Alabama, and has been in business for almost 70 years. Standard designs, manufactures and distributes case goods, *i.e.*, home furniture often sold as sets.

27. In or around the first half of 2015, Todd Evans, who is the President of Standard, and Bo Morrison, who was a Vice-President at the time, began exploring the idea of a licensing partnership with Joanna and Chip Gaines.

28. The Gaineses own and operate Magnolia Homes, a remodeling and design business based in Waco, Texas, and have become famous for their featured roles in a reality-based television show on HGTV called "Fixer Upper".

29. Each episode of Fixer Upper follows the Gaineses as they use their keen eyes for style and design to transform often drab and outdated houses into stylish and appealing new homes.

30. Mr. Evans believed that a licensing partnership with the Gaineses would be mutually beneficial for Standard and the Gaineses and so he worked out an arrangement whereby Joanna and Chip Gaines' brand would be used by Standard to manufacture and market furniture under the brand name Magnolia Home.

31. The Gaineses were to be and are heavily involved in the design and appearance of the furniture, drawings of the furniture, and providing other

COMPLAINT

specifications for the furniture. Standard would then undertake to build the furniture and market it using the Gaineses brand and identity.

### B. Standard and IFM Engage Defendants to Expedite the Creation of a Supply Chain in China

32. IFM and the Gaineses entered into a licensing agreement in or around May of 2015 and planned to launch their new Magnolia Home product line at the furniture industry's biggest trade show held annually in October in High Point, North Carolina.

33. Because of the relatively brief time available before the October trade show, there was a need to expedite the creation of a supply chain with original manufacturers and suppliers of the various materials needed to create the furniture.

34. Standard and IFM therefore decided to reach out to Li & Fung, a global sourcing and supply chain management firm, whose purported expertise includes "product design and development, raw material and factory sourcing, production planning and management, quality assurance and export documentation to shipping consolidation." (Li & Fung Annual Report 2004).

35. In or around June of 2015, Standard and IFM reached out to Chad Long, who, upon information and belief, was and is the Senior Vice-President, Upholstery Division, of Li & Fung. Mr. Long maintains offices in both Tupelo, Mississippi, as well as at the Irvine, California offices of True Innovations.

36. Mr. Long, as well as an Executive Vice-President of True Innovations named Dan Tacheny, also based in Irvine, California, negotiated with Bo Morrison at Standard, and the parties made an agreement whereby Standard and IFM would pay True Innovations and Li & Fung to act as brokers in pulling together the supply chain, including original equipment manufacturers and material vendors, to create the new Magnolia Home product line. However, at all times it was understood and agreed-upon that Standard, IFM and the Gaineses would control the choice of material and overall quality of craftsmanship of the product.

37. To that end, a meeting was convened at a True Innovations factory in China so that representatives of Standard, IFM and the Gaineses, on the one hand, and representatives of True Innovations and Li & Fung could come to an agreement on the type and quality of leather to be used in the Magnolia Home furniture.

38. At this meeting, the parties agreed that the raw material to be used would be a top grain cowhide, a sample piece of which was cut and created as the "master standard" and signed by all of the parties. A piece of the master standard was cut for Standard/IFM, for True Designs and Li & Fung and then for the manufacturer. The parties agreed that the color and finish would be distressed leather, per the photograph below, consistent with the overall style that Magnolia Homes was seeking to create.



### C. Li & Fung Pulls a "Bait and Switch" With Respect to Raw Material

39. Before the initial shipment furniture left the manufacturer in China, a China-based "quality control" team of Standard was required to inspect and approve it. In the ordinary course, Standard's quality control team would review the entire population of product to be shipped.

40. In this case, however Li & Fung arranged it so that the quality control team would only be shown a limited sampling of the product, less than 10% of the units actually shipped. Because these hand-selected samples—measured against the benchmark of the master standard—appeared within the range of tolerance for

variation in color and acceptable in terms of raw material, Standard's and IFM's quality-control team in China signed off on shipment.

41. Much to Standard's and IFM's dismay, however, when the entire population of the product was received, it was not only substandard but manufactured using a completely different animal hide—rather than use top grain cowhide, representatives of Li & Fung had ordered the use of water buffalo hide, in order to save approximately 7-8 cents a square foot on the raw material. In addition, the color and finish was a substantial departure from the distressed leather color and finish that had been agreed upon.



42. Standard and IFM only learned of this "bait and switch" when their licensing partner Joanna Gaines opened a shipment of the Magnolia Home furniture and discovered the defective product. She immediately contacted Standard, which began its own investigation.

43. Although the dramatic variation in color and finish is obvious to the naked eye, and the switch in material is detectable by a layperson, Standard and IFM had an expert in leather materials confirm that the material at issue in the defective product was and is water buffalo hide.

44. Furthermore, when Standard and IFM interviewed a factory owner in China who had actually supplied the material, the factory owner "came clean" and informed Standard and IFM that representatives of Li & Fung had specifically instructed him to use the cheaper water buffalo hide in order to save Li & Fung costs.

45. Standard's and IFM's quality control team in China were and are insistent that the product actually received in the United States was never approved for shipment by them. Indeed, none of the defective products reviewed by Standard's United States-based quality control team bears an approval stamp from its China-based quality control team, anywhere on the product. Li & Fung deliberately concealed this defective product from Standard and IFM.

**D. <u>Defendants Refuse to Inspect and Acknowledge the Defective Product</u>**

46. Upon discovering the defective product, Standard contacted its entire dealer base that had purchased the two suites of furniture at issue and those dealers confirmed that a significant amount of their respective inventories was defective.

47. At the same time, representatives of Standard reached out to Mr. Long of Li & Fung and Mr. Tacheny of True Innovations, in an attempt to achieve an informal resolution and avoid litigation.

48. Both Bo Morrison and Todd Evans of Standard sent emails to Messrs. Long and Tacheny informing them of the defective inventory and requesting that they inspect the inventory for themselves at Standard's distribution center. Within the industry, such an inspection is standard operating protocol.

49. In this case, however, Messrs. Long and Tacheny declined to perform an inspection, which was highly unusual and evidence of their bad faith. Instead, Mr. Long claimed that Mr. Morrison and his team had signed off on samples and closing inspection and that the defects were merely a "color variation", which had been approved by Standard and IFM quality control personnel.

50. This was and is untrue, of course, and a visual inspection of the product would have easily demonstrated it was untrue. Defendants continued to decline to

perform such an inspection, even after being presented with a formal claim for reimbursement of the approximately $650,000 in costs incurred by Standard for the defective merchandise and freight and customs charges.

51. Defendants responded by denying liability and claiming that Standard had not "articulated [its] claim in sufficient detail." Once again, Defendants declined to perform an inspection, asking instead for "high-resolution photos" of the defective product. In addition to the photos shown above, a high-resolution photo of more of the defective product is presented below:



### E. Li & Fung Intentionally Interferes With Plaintiffs' Prospective Business Advantage

52. Heaping insult upon injury, Li & Fung embarked on a campaign to interfere with and disrupt Standard's and IFM's relationship with several of the suppliers and manufacturers in China with whom Standard and IFM have done and expect to continue to do business.

53. Li & Fung sent several letters to these Chinese vendors, in which Li & Fung impugned the reputation of Standard and IFM and attempted to dissuade these vendors from doing any further business with Standard and IFM.

54. In addition to causing reputational harm to Standard and IFM, these written communications have disrupted Plaintiffs' contractual relations and prospective business advantage and has caused and will continue to cause substantial damage to Standard and IFM, in an amount to be proven at trial, but believed to be in excess of $1 million.

## FIRST CAUSE OF ACTION

(Breach of Contract)

(By Both Plaintiffs Against All Defendants)

55. Plaintiffs re-allege and incorporate each and every allegation contained in paragraphs 1 through 54 as if set forth fully herein.

56. Plaintiffs and Defendants entered into an agreement wherein Defendants agreed to pay Defendants to create a supply chain, including original equipment manufacturers and material vendors, to manufacture leather upholstered furniture using top grain cowhide.

57. Plaintiffs have performed all of their obligations, covenants, and conditions required of them under the agreement, except to the extent any such obligations, covenants or conditions have been excused, prevented or waived by Defendants' acts and/or omissions.

58. Defendants have breached this agreement by instructing the suppliers of material and manufacturers of the furniture at issue to use water buffalo hide instead of top grain cowhide.

59. Plaintiffs have been damaged as a direct and proximate result of Defendants' breach in the amount of at least $650,000.

## SECOND CAUSE OF ACTION

(Negligence)

(By Both Plaintiffs Against All Defendants)

60. Plaintiffs re-allege and incorporate each and every allegation contained in paragraphs 1 through 54 as if set forth fully herein.

61. Defendants had a legal duty to use due care in creating a supply chain, including original equipment manufacturers and material vendors, to manufacture and supply leather upholstered furniture using top grain cowhide to Plaintiffs.

62. Defendants breached the duty of care and Plaintiffs were injured as a result.

63. Defendants' breach was the direct and proximate cause of Plaintiffs' injury.

## THIRD CAUSE OF ACTION

(Fraud by Concealment)

(By Both Plaintiffs Against Defendant Li & Fung and DOES 1-10)

64. Plaintiffs re-allege and incorporate each and every allegation contained in paragraphs 1 through 54 as if set forth fully herein.

65. Defendant Li & Fung and DOES 1-10 actively concealed that it had instructed vendors in China to use water buffalo hide instead of top grain cowhide in the manufacture of leather upholstered furniture for Plaintiffs and/or prevented Plaintiffs from discovering that fact.

66. Plaintiffs did not know of the concealed fact.

67. Defendant Li & Fung and DOES 1-10 intended to deceive Plaintiffs by concealing the fact.

68. Plaintiffs reasonably relied on Defendant Li & Fung's and DOES 1-10's deception.

69. Plaintiffs were harmed.

70. Defendant Li & Fung's and DOES 1-10's concealment was a substantial factor in causing Plaintiffs' harm.

71. The aforementioned conduct of Defendants was intentional and was done with the intent of depriving Plaintiffs of property rights and legal rights and causing Plaintiffs' injury. Defendants' conduct was despicable and subjected Plaintiff to unjust hardship in conscious disregard of Plaintiffs' rights. Defendants

conduct evinces malice, oppression or fraud and, accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be established at trial.

### FOURTH CAUSE OF ACTION

(Intentional Interference with Prospective Economic Advantage)

(By Both Plaintiffs Against Defendant Li & Fung and DOES 1-10)

72. Plaintiffs re-allege and incorporate each and every allegation contained in paragraphs 1 through 54 as if set forth fully herein.

73. Plaintiffs were in economic relationship with certain suppliers and manufacturers and other vendors in China that would have resulted in a reasonably probable future economic benefit or advantage to Plaintiffs.

74. Defendants knew of the relationship and intended to disrupt the relationship.

75. Defendants engaged in wrongful conduct and thereby the relationship between Plaintiffs and certain suppliers and manufacturers and other vendors in China.

76. The aforementioned conduct of Defendants was intentional and was done with the intent of depriving Plaintiffs of property rights and legal rights and causing Plaintiffs' injury. Defendants' conduct was despicable and subjected Plaintiff to unjust hardship in conscious disregard of Plaintiffs' rights. Defendants conduct evinces malice, oppression or fraud and, accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be established at trial.

### FIFTH CAUSE OF ACTION

(Violation of Section 17200 of the California Business and Professions Code)

(By Both Plaintiffs Against All Defendants)

77. Plaintiffs re-allege and incorporate each and every allegation contained in paragraphs 1 through 54 as if set forth fully herein.

78. This cause of action is brought pursuant to Unfair Competition Law at Business & Professions Code § 17200 *et seq*. Defendants' conduct constitutes unfair,

unlawful and/or fraudulent business practices within the meaning of Business & Professions Code § 17200

79. Pursuant to Business & Professions Code § 17203, Plaintiffs seek from Defendants, and each of them, restitution and the disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by Defendants as a result of Defendants' conduct in violation of Business & Professions Code § 17200 *et seq.*

80. Pursuant to Business & Professions Code § 17204, Plaintiffs seek an order of this Court enjoining Defendants, and each of them, from continuing to engage in the acts as set forth in this complaint, which acts constitute violations of Business & Professions Code § 17200 et seq. Plaintiffs and the public will be irreparably harmed if such an order is not granted.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment against the Defendants as follows:

1. For damages in an amount to be proven at trial;
2. For punitive or exemplary damages;
3. For restitution and the disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by Defendants as a result of Defendants' conduct in violation of Business & Professions Code § 17200 *et seq.*;
4. For an order of this Court enjoining Defendants, and each of them, from continuing to engage in the acts as set forth in this complaint, which acts constitute violations of Business & Professions Code § 17200 *et seq.*;
5. For prejudgment and post-judgment interest;

6. For any such other and further relief as this Court may deem just and proper.

Dated: November 22, 2016      **BROWN, NERI, SMITH & KHAN, LLP**

By: /s/ Geoffrey A. Neri
Geoffrey A. Neri
Attorneys for Plaintiffs Standard
Furniture, Inc. and International
Furniture Marketing, Inc.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a jury for all issues triable by such.

Dated: November 22, 2016      **BROWN, NERI, SMITH & KHAN, LLP**

By: /s/ Geoffrey A. Neri
Geoffrey A. Neri
Attorneys for Plaintiffs Standard
Furniture, Inc. and International
Furniture Marketing, Inc.